UNITED STATES of America

v.

Stanley WEISZ, Appellant.

UNITED STATES of America

v.

Eugene Robert CIUZIO.

Nos. 82–2123, 82–2154.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 15, 1983.

Decided Sept. 13, 1983.

Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1285, 1305.

See also 539 F.Supp. 363.

Karl W. Pilger, Washington, D.C. (appointed by the court), and Michael F. Dennis, Garden City, N.Y., for appellants.

Daniel S. Seikaly, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell, Stephen R. Spivack and Melanie G. Dorsey, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before BORK, Circuit Judge, MacKINNON, Senior Circuit Judge, and FAIRCHILD,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

In this appeal we are asked to review the convictions of Eugene Ciuzio and Stanley Weisz for offenses based upon the Federal Bureau of Investigation's undercover investigation of government corruption commonly known as "Abscam." Ciuzio, Weisz and a third individual, William Rosenberg, arranged a meeting between United States Congressman Richard Kelly and agents of the FBI who were posing as representatives

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

of two wealthy Arabs as part of the Abscam operation. At that meeting Kelly accepted $25,000 from one of the FBI agents and, in return, promised to use his position in Congress to assist the Arabs to become permanent residents of the United States. Unbeknownst to Ciuzio, Weisz and the others, the FBI recorded the entire illicit transaction on video tape.

On the basis of this and other evidence, Ciuzio and Weisz[1] were charged with conspiracy to commit bribery, in violation of 18 U.S.C. § 371 (1976), aiding and abetting bribery, in violation of 18 U.S.C. § 2 (1976), and interstate travel to commit bribery, in violation of 18 U.S.C. § 1952 (1976). Ciuzio, Kelly and Weisz were initially tried together and a jury found each guilty on all counts. However, the district court granted Ciuzio and Weisz a new trial because of "the disparity in the amount of evidence as it related to Kelly on the one hand and . . . Weisz and Ciuzio on the other, and in light of . . . the manner in which [Kelly's defense] was put forth . . . ." *United States v. Kelly,* 539 F.Supp. 363, 377–78 (D.D.C. 1982) (footnote omitted).[2] A second jury trial again found Ciuzio and Weisz guilty on all counts.

On appeal, Ciuzio and Weisz contend that the district court erred in admitting certain evidence offered by the government and in denying their motions for judgment of acquittal on the grounds of insufficient evidence. Ciuzio also contends that he was denied his constitutional right to represent himself and that the FBI's conduct in furtherance of Abscam was so outrageous that principles of due process required dismissal of the indictment. For the reasons set forth below, we find these contentions to be without merit and affirm the judgments entered by the district court.

## I. FACTS

### A. The Abscam Investigation

In the spring of 1978, the FBI began an undercover investigation in an attempt to recover stolen art and securities and to catch individuals dealing in such items.[3] The name given to this investigation was "Abscam," a name derived from Abdul Enterprises, a fictitious, FBI-created organization which ostensibly represented two Arabs of considerable wealth interested in financing business ventures in the United States.[4] Convicted confidence man Melvin Weinberg was enlisted by the FBI to assist in the operation of Abscam and to give the investigation credibility with criminal elements.[5] Weinberg and a number of FBI

1. Kelly was charged in the same indictment with bribery, in violation of 18 U.S.C. § 201(c) (1976), conspiracy to commit bribery, and interstate travel to commit bribery. Rosenberg, who had previously pled guilty to a charge of conspiracy to commit bribery, was named as an unindicted co-conspirator. *See United States v. Kelly,* 539 F.Supp. 363, 367 n. 14 (D.D.C.1982).

2. The district court granted Kelly's motion to dismiss the indictment because it concluded that the FBI's actions in furtherance of Abscam were so outrageous that prosecution of Kelly was barred by principles of due process. *United States v. Kelly, supra,* 539 F.Supp. at 370–77. This Court reversed the district court's dismissal of the indictment and directed the district court "to reinstate the indictment and the verdict of the jury" with respect to Kelly. *United States v. Kelly,* 707 F.2d 1460, 1461 (D.C.Cir.1983) (per curiam).

3. Trial Transcript (Tr.) at 635, 1060.

4. Tr. at 635–36, 724–R.

5. Tr. at 637–38, 724–P, 724–V to –W, 804–05, 952, 1052. Prior to 1977, Weinberg operated an illegitimate business known as London Investors. Claiming to represent a number of European banks, Weinberg promised to arrange loans for individuals upon payment, *in advance,* of "appraisal" and "inspection" fees. Tr. at 724–W to –X, 1055–57. Weinberg typically misrepresented the chances of obtaining such financing and, with rare exception, simply absconded with the fees. Tr. at 1057–59.

In 1977, as a result of his London Investors activities, Weinberg pled guilty to fraud charges in the United States District Court for the Western District of Pennsylvania. Tr. at 1052–53, 1059–60. In exchange for his cooperation in four on-going investigations, the FBI interceded on Weinberg's behalf before the district court. As a result, Weinberg was sentenced to three years probation and permitted to return to New York to assist the FBI. Tr. at 1053–55, 1059–60. Starting in 1978, Weinberg assisted the FBI with the Abscam investigation and received $1000 per month—raised in 1979 to $3000 per month—and several bonuses from

agents "held" various positions in Abdul Enterprises. Beginning in January 1979, FBI special agent Anthony Amoroso assumed the role of president of Abdul Enterprises.[6]

In the latter part of 1978 Abdul Enterprises was approached by two businessmen, William Rosenberg and William Eden, concerning the possibility of financing certain equipment to be leased to the City of Camden, New Jersey. To further that transaction, Eden and Rosenberg introduced the representatives of Abdul Enterprises to Angelo Errichetti, then Mayor of Camden. When it became apparent to the Abscam operatives that Errichetti was corrupt, the focus of Abscam shifted to the investigation of political corruption and infiltration of legitimate business by organized crime.[7]

On July 26, 1979, Errichetti met with Weinberg and Amoroso on Abdul Enterprises' yacht in Florida. During the day Amoroso told Errichetti that the wealthy Arabs who controlled Abdul Enterprises were concerned that they might encounter problems if they sought to come to the United States as permanent residents, and indicated that the Arabs wanted "assurances" from public officials that they would be able to remain in the United States. Errichetti responded that he could obtain such assurances, "if

[Abdul Enterprises] had the money."[8] Thereafter, on August 22, 1979, Errichetti introduced the Abscam operatives to United States Congressman Michael Myers who accepted $50,000 in exchange for his promise to assist the wealthy Arabs.[9] Thus was introduced the "asylum scenario"—whereby several members of Congress were paid bribes to ensure that they would introduce private immigration legislation on behalf of the wealthy Arabs if and when necessary—which ultimately led to the convictions of Ciuzio and Weisz at issue here.

### B. Abscam as it Involved Ciuzio and Weisz

#### 1. Abscam's Introduction to Kelly

In the early part of September 1979, Amoroso sought Rosenberg's aid in obtaining political assistance for his Arab employers. Amoroso told Rosenberg that he was interested in meeting congressmen willing to introduce legislation which would give the Arabs permanent resident status and that the congressmen, as well as the individuals recruiting the congressmen, would be paid for their assistance.[10] In October 1979 Rosenberg related the proposal to his business associate, accountant Stanley Weisz.[11] Rosenberg told Weisz that the Arabs were concerned that they might have problems staying in the United States and wanted to

---

the FBI. In total Weinberg was paid in excess of $225,000 for his Abscam work. Tr. at 758–60, 1060–61.

**6.** Tr. at 635–36, 724–Z to –BB.

**7.** Tr. at 639–40. *See United States v. Kelly,* 707 F.2d 1460, 1462 (D.C.Cir.1983) (opinion of MacKinnon, J.). Errichetti ultimately led Abscam to a number of other corrupt public officials. *See United States v. Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); *United States v. Jannotti,* 673 F.2d 578 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). In March 1979 Abscam uncovered corruption in the Immigration and Naturalization Service. *See United States v. Alexandro,* 675 F.2d 34 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982).

**8.** Tr. at 639–40.

**9.** *United States v. Myers,* 527 F.Supp. 1206, 1212 (E.D.N.Y.1981), *aff'd,* 692 F.2d 823 (2d

Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983).

**10.** Tr. at 641–42.

**11.** Tr. at 817, 1073, 1105–06, 1221–22. Weisz first met Rosenberg in 1965 when Rosenberg, who at that time was a stockbroker, performed a "due diligence" study of one of Weisz' corporate clients. Rosenberg then "dropped out of sight" and had no further dealings with Weisz until 1978. At that time Weisz ran into Rosenberg and learned that Rosenberg had served time in jail for stock fraud and was seeking employment. Weisz attempted to assist Rosenberg in his job search. Tr. at 1101–05. In 1979, Rosenberg told Weisz that he was "working with Arab representatives on a number of projects" and, in September 1979, introduced Weisz to Amoroso and Weinberg. Tr. at 1105–06, 1221. Amoroso and Weinberg did not discuss the asylum scenario with Weisz at that time.

meet congressmen who would introduce favorable legislation. Rosenberg suggested that Weisz would receive a fee for the proper introductions.[12] Weisz responded that he did not know any congressmen.[13]

On November 20, 1979, Weisz, while on vacation in Boynton Beach, Florida, met with his longtime business associate, Eugene Ciuzio.[14] During their conversation, Weisz related the wealthy Arabs' need to "make friends" with congressmen, explaining that "they were bringing a lot of money to [the United States] for investment" and were worried that "they might have difficulty staying in this country."[15] Ciuzio replied that he was working with a Congressman who might be willing to help the Arabs and indicated that he would check with the Congressman and get back to Weisz. For his part, Weisz agreed to contact Rosenberg and, if the Arabs were still interested, have Rosenberg call Ciuzio.[16] A few days later Ciuzio called Weisz in Boynton Beach and told him that the Congressman was interested in helping the Arabs.[17]

In mid-December 1979 Rosenberg stopped by Weisz' office and again mentioned his work for the wealthy Arabs. Weisz informed Rosenberg of Ciuzio's friendship with a Florida Congressman who was willing to help the Arabs with their immigration troubles if they were still interested.[18]

Rosenberg checked with Amoroso and Weinberg, and then called Weisz and told him that the Arabs' representatives "were very interested" in meeting the Congressman. Rosenberg indicated to Weisz that the Arabs would pay $250,000 for such an introduction and that he wanted $50,000 of that sum.[19] Weisz gave Rosenberg Ciuzio's telephone number, and agreed to call Ciuzio and ask him to call Weinberg. Weisz called Ciuzio and told him of the Arabs' continued interest in meeting congressmen and of the $250,000 fee, and to expect a call from Weinberg. Ciuzio and Weisz agreed that Weisz, like Rosenberg, would receive $50,000.[20] Meanwhile, Rosenberg called Weinberg and gave him Ciuzio's name and telephone number, explaining that Ciuzio was "the connection to the Congressman" and that Weinberg would have to "deal through" Ciuzio.[21]

As a result of these efforts, Amoroso and Weinberg met with Ciuzio on December 19, 1979, in Hollywood, Florida, to discuss the transaction. Amoroso explained the assistance that would be expected of the Congressman:

> These [Arabs] are smart enough, they're investing their money all over the world . . . . They figure at some point in time they're gonna have to . . . get outa there . . . . Now where is the best place to

---

**12.** Tr. at 817, 1073, 1106, 1221–22. Weisz testified that Rosenberg did not mention that the congressmen would receive a fee for their assistance. Tr. at 1222.

**13.** Tr. at 817, 1106.

**14.** Tr. at 817, 1073–74, 1108–10, 1115, 1232. Ciuzio had referred a friend to Weisz for assistance in a federal tax matter. The purpose of the meeting was to provide Weisz with the details of that dispute. Tr. at 1111–17, 1122–27.

Weisz first met Ciuzio in 1960 when Ciuzio was involved in providing trucking services for a number of Weisz' clients in New York. Thereafter Weisz performed accounting work for Ciuzio for a number of years. When Ciuzio moved from New York to Florida, Weisz continued to advise Ciuzio on various financial transactions. In return, Ciuzio referred individuals in need of an accountant to Weisz. Tr. at 1108–11.

**15.** Tr. at 1127, 1232–33, 1258.

**16.** Tr. at 1128–30, 1233, 1259. Weisz testified that Ciuzio gave no indication that the Congressman was corrupt. Tr. at 1233.

**17.** Tr. at 1129, 1258–59. Weisz could not recall if Ciuzio had told him the Congressman's name during this conversation, but opined that Ciuzio "probably did mention the [C]ongressman's name." Tr. at 1129.

**18.** Tr. at 1131–32, 1259.

**19.** Tr. at 1133–35, 1260, 1262.

**20.** Tr. at 1135–37, 1233–34, 1237, 1260–63, 1266. Weisz testified that he expected the balance of the $250,000 fee to go to Ciuzio; it never occurred to Weisz that some of the fee might go to the Congressman. Tr. at 1261–62, 1265.

**21.** Tr. at 642–43.

come and live but this country? ... So what they're doin is they're startin' to put themselves in a position so that when ... they come here ... we [can] call the Congressman and say, hey look, the [Arabs are] here [and] ... we want ya to introduce the legislation now to keep em here.[22]

Weinberg indicated that the Arabs were willing to pay a total of $250,000, with $100,000 going to the Congressman, for the Congressman's assistance. He suggested that the Congressman be paid $25,000 at an initial meeting, with the balance paid when legislation was required.[23] Weinberg made it clear that the meeting and payment of $25,000 was to assure the Arabs that the Congressman

> got the money [and] when we're ready to move that he is gonna be with us.[24]

Ciuzio told Amoroso and Weinberg that the individual was Congressman Richard Kelly and intimated that *he and Kelly had had previous dealings of a similar nature.*[25] Ciuzio indicated that he understood the nature of the proposal,[26] revealing that Weisz had outlined it for him over lunch in Florida:

> I met Stanley [Weisz] at Boy[n]ton Beach .... We had lunch at Bernard's. He

says hey ya know a Congressman? Yeah. [He says] I got a ... Sheik ... [with] 30 billion .... He says, they gotta get 'em in [the] country. I said unless he's a f___in fugitive ... I guess it can be done. He says ya really got a Congressman? I says we're engaged, ya know what I mean? We're that f___in tight.[27]

Ciuzio also indicated that in a later conversation Weisz had given him the $250,000 figure and that they had arrived at a split of $100,000 for Kelly because "that['s] what [Kelly] needs to straighten his whole life out."[28] Ciuzio claimed to have explained the proposal to Kelly and that Kelly had left the arrangements to him.[29]

Noting that he was "obligated to protect [Kelly] in the sensible way," Ciuzio opposed a direct payment to Kelly and suggested that the money instead be escrowed through Weisz.[30] Amoroso assured him that a private meeting between Amoroso and Kelly would protect the Congressman, and that the wealthy Arabs would invest in Kelly's district to provide an explanation for Kelly's assistance.[31] Ciuzio agreed to "lay out the story" for Kelly, but only if he received "clearance" from Weisz because it was "his package."[32] Amoroso and Weinberg suggested that Ciuzio set up the meet-

---

22. Transcript of Meeting of Dec. 19, 1979, at 28. *See id.* at 11, 14, 22, 28–29.

23. *Id.* at 17–19, 22, 28–29.

24. *Id.* at 33.

25. *Id.* at 12, 16–17, 31–32, 38–39. Referring to Kelly, Ciuzio asserted:
> Not that I'll ever use it on [him], of course, but I'm just sayin uh umm. *He's in.* Ya know, we were holdin' hands for a long time, now he's pregnant, ya understand. *He's already takin' money* so we're married and that's all.

*Id.* at 39 (emphasis added).

26. *Id.* at 29, 33. Ciuzio had the following exchange with Amoroso:
> CIUZIO: So now what you're saying the Congressman really don't have to do nothin' ....
> AMOROSO: No, not until he comes ...
> CIUZIO: All right.
> AMOROSO: ... if he comes.
> CIUZIO: Now, ... you're sayin ya gonna give em twenty-five thousand.

> AMOROSO: Right.
> CIUZIO: For doin nothin.
> AMOROSO: For doin nothin.
> CIUZIO: To stand by.
> AMOROSO: To stand by. And if the guy comes ... we want the guarantee ... [that Kelly's] gonna introduce the legislation.

*Id.* at 29. Ciuzio later noted, "[t]his ain't exactly ahh a f___in real estate deal." *Id.* at 52.

27. *Id.* at 12. *See id.* at 35–37.

28. *Id.* at 17, 35–36.

29. *Id.* at 16, 26, 30, 35.

30. *Id.* at 16, 18–19, 25, 27, 35–37.

31. *Id.* at 18–19, 22, 29–30, 34–35.

32. *Id.* at 23–24, 33–34, 36, 52–53. Ciuzio told Amoroso and Weinberg:
> If ... Stanley [Weisz] agrees to it. I don't mind telling ya ... [t]his to me is his package. He's bringing it. He's the vehicle.

*Id.* at 23.

ing for January 8 or 9, 1980, at Abdul Enterprises' Washington, D.C., townhouse.[33]

On December 20, 1979, Weinberg called Ciuzio and inquired if Ciuzio had spoken with Weisz about the deal. Ciuzio said that he had not, but that he had talked to Kelly. Kelly had called him from his congressional office and Ciuzio asked Kelly to call back from a "public phone booth" to discuss the transaction.[34] On December 21, 1979, Ciuzio called Weinberg and indicated that he had spoken to Kelly and "told him to stand by." Ciuzio said that Kelly was available for a January 8 meeting in Washington.[35]

Ciuzio also told Weinberg that he had discussed the deal with Weisz and reiterated that he and Weisz did not like the idea of the money being paid directly to the Congressman. Ciuzio again suggested that Weisz handle "all the money."[36] Weinberg insisted that Kelly be directly involved in the transaction, but indicated that

> [a]ll he [Amoroso] wants the Congressman [to do] is to tell him what he's gonna do for him for the money.[37]

**33.** *Id.* at 17, 40.

**34.** Transcript of Telephone Call of Dec. 20, 1979, at 1–2, 8, 10.

**35.** Transcript of Telephone Call of Dec. 21, 1979, at 3.

**36.** *Id.* at 1–2, 8–10. Ciuzio was also concerned that Kelly not be told that Ciuzio, Rosenberg and Weisz would receive $150,000 in the deal; Weinberg assured Ciuzio that Amoroso would not mention their shares to Kelly. *Id.* at 11–14.

**37.** *Id.* at 13. *See id.* at 7, 14. Weinberg told Ciuzio that "[t]hat's the only way we'll do it . . . ." *Id.* at 2.

**38.** *Id.* at 4.

**39.** *Id.* at 13. *See id.* at 18. Ciuzio also requested that Weinberg call Weisz and discuss the deal with him. *Id.* at 1, 3, 17, 19. Weinberg called Weisz immediately, but the substance of their conversation was in dispute at trial. Weinberg did not record the call, purportedly because someone unaware of the Abscam investigation entered the room where he was making the call. Tr. at 984–85, 992, 1139, 1268. Weinberg testified that Weisz told him that "whatever way Gino [Ciuzio] wants to handle it is all right with me . . . ." Tr. at 992–93, 996–97.

"[A]fter that," Weinberg asserted, "I don't give a damn who comes and picks money up or what you do with it."[38] Ciuzio agreed, but requested that they use "the right script, nice and soft."[39]

On January 8, 1980, Weisz and Rosenberg flew together from Long Island, New York, to National Airport in Washington, D.C., where they were met by Ciuzio, who had arrived from Orlando, Florida, earlier in the day. The three of them checked into the Twin Bridges Marriott and then went to the Madison Hotel where they were to meet Kelly for dinner. Kelly was delayed, however, and arrived only after they had finished dinner. After a brief conversation over coffee, Rosenberg called Weinberg, who sent Abdul Enterprises' limousine to bring the four men to the Georgetown townhouse.[40]

### 2. *Abscam's Payoff to Kelly*

Shortly after 10:00 p.m. on January 8, 1980, Ciuzio, Kelly, Rosenberg, and Weisz

Weisz, on the other hand, testified that Ciuzio called him prior to Weinberg's call and indicated that he did not believe the Arabs' representatives would pay the $250,000. Ciuzio asked Weisz to support his demand that the $250,000 be placed in escrow. Tr. at 1138–39, 1267–68. When Weinberg called, Weisz claimed to have insisted that the Arabs' deposit the $250,000 in an escrow account with a Florida attorney. When Weinberg refused to agree to do so and asserted the deal was off, Weisz testified that he replied, "So be it." Tr. at 1139–40, 1268–69. Weisz stated that Rosenberg called him a few days later and told him that Kelly was going to meet Amoroso and Weinberg on January 8, 1980, in Washington, D.C., and that *Ciuzio* was going to receive $25,000 at the meeting for the introduction. Tr. at 1156–57, 1274. According to Weisz, Ciuzio subsequently verified Rosenberg's statement, adding only that the balance of the $250,000 would be paid in a few weeks. Tr. at 1157, 1274–75.

**40.** Tr. at 860–61, 1015–17, 1161–68. According to Weisz' testimony, he traveled to Washington because Ciuzio told him that Kelly needed an accountant and suggested that Weisz meet Kelly to discuss his becoming one of Weisz' clients. Tr. at 1158–60, 1276–77. Weisz admitted, however, that he never spoke to Kelly regarding the possibility of Kelly becoming a client. Tr. at 1277.

arrived at Abdul Enterprises' townhouse to meet with Amoroso and Weinberg. Initially Weinberg met with Ciuzio, who vigorously sought to dissuade Amoroso and Weinberg from attempting to bribe Kelly directly.[41] The two ultimately agreed that Kelly would acknowledge that the money was in exchange for his agreement to assist the Arabs, but that Ciuzio would actually take the money from the meeting:

> WEINBERG: You can be in with him, all right?
>
> CIUZIO: Well I think I should be here to, ahh steer the f___ing thing . . .
>
> WEINBERG: Let him [Amoroso], let, just put the money on the table and say here, take it . . . here Congressman, here's the twenty-five thousand, and that's it, you pick it up.
>
> CIUZIO: Go along with that, he knows the answers too.
>
> WEINBERG: All right, so . . .
>
> CIUZIO: I rehearsed with him.[42]

After this conversation Kelly and Amoroso met privately. Amoroso explained the Arabs' immigration difficulties and their willingness to pay to have "friends" in Congress when required. He also indicated that the Arabs would invest in their "friends'" districts in order to protect them from pressure.[43] Kelly's response revealed that he was already aware of the purpose for the investments:

> AMOROSO: Now I realize that ahh there's a possibility that ahh if, if you were to introduce somethin like this, that

ahh, people would ask, well why is he doing it, ya know, well what's the reason, now . . .

> KELLY: I've got the reason.
>
> AMOROSO: Ok, what . . . would that be . . . investing?
>
> KELLY: Sure.[44]

Kelly agreed to assist the Arabs, and indicated that Amoroso's arrangement with Ciuzio was fine:

> All of this stuff that you've been talking about . . . *I don't know anything about that, I'm not involved with it* . . . . Gino [Ciuzio] and these guys are my friend[s] . . . what you said makes a lot of sense to me . . . I'm gonna stick with ya . . . *and you can put me out there on the hill, and when you come back in the morning, I'll still be there.* . . . So this . . . will be helpful to me and . . . maybe . . . down the road sometime, you can do me a favor. *But in the meantime, whatever these guys are doing is all right, but I got no part in that.* . . . [I]n other words, your arrangement with these people is . . . all fine . . . . [Y]ou have my assurance that what you have told me here, sounds like a good thing and . . . I will . . . stick by these people.[45]

After Amoroso received a call from Assistant United States Attorney Jacobs who was monitoring the meeting, Kelly asked to talk to Ciuzio. Ciuzio talked to Kelly privately for approximately ten minutes and, when Ciuzio emerged, he told Amoroso that Kelly

---

**41.** Transcript of Meeting of Jan. 8, 1980, at 1–11. Ciuzio said, "Don't hand him no f___ing money, don't talk money, tell him what the problem is . . . ." *Id.* at 3. Later Ciuzio and Weinberg had the following exchange:
> WEINBERG: Well, he knows he's getting money right?
> CIUZIO: He ain't taking no f___ing money in his hand.
> WEINBERG: All right, you'll take it . . .
> CIUZIO: All right.
> WEINBERG: He'll hand it to you.
*Id.* at 4.

**42.** *Id.* at 10. Of similar import is the following:
> WEINBERG: Let Tony [Amoroso] hand you the money in front of him. Long as we know he's getting money.

> CIUZIO: That's ok. But . . . [y]a can't make him a f___ing hood, ya know.
> WEINBERG: No. But he's gotta know that he's getting paid to do it . . . .
*Id.* at 3–4. *See* note 41 *supra.*

**43.** Transcript of Meeting of Jan. 8, 1980, at 11–13.

**44.** *Id.* at 12–13. After Kelly inquired about the types of investments the Arabs wanted to make, he stated, "I've got the place." *Id.* at 14–15.

**45.** *Id.* at 16 (emphasis added).

would do what the Arabs wanted, but that Amoroso should not give Kelly any money.[46]

As Amoroso and Kelly resumed their discussion, Amoroso sought to clarify Kelly's position. Kelly made it clear that he wanted the money given to Ciuzio:

KELLY: [Y]ou and I gotta . . . learn to talk to each other.

AMOROSO: Well I know . . .

KELLY: [D]on't stumble around, jump in there . . .

AMOROSO: Jump in there and give it to you?

KELLY: Sure.

AMOROSO: Ok. Well I was under the impression . . . when this thing was set up . . . that I was gonna give you something . . . tonight . . . .

KELLY: Yeah.

AMOROSO: Ok, and that the rest was gonna come . . .

KELLY: Yeah.

AMOROSO: When you introduce that.

KELLY: That's right.

AMOROSO: Ok, is that, is that still . . .

KELLY: Yeah. Here's . . . what the thing is. Umm ahh just simply deal with Gino [Ciuzio] about it.

AMOROSO: Ok. You want me to give him the money . . . here?

KELLY: Sure.[47]

However, when Amoroso indicated that all of the $25,000 was intended to go to Kelly, and that Ciuzio and the others would be separately compensated, Kelly was confused:

I understood that what you were talking about was . . . all there was as far as Tony [sic, should be Ciuzio] was concerned and so as far as I'm concerned, he takes that. . . . [B]ut I see I didn't know . . . about this other arrangement. . . . It's . . . all right but I didn't know about that. So let's talk about it some.[48]

Amoroso explained that he thought that giving the money directly to Kelly would avoid witnesses, thus protecting him. Kelly agreed:

AMOROSO: I thought that the best way of doing it was . . . a one on one between you and I. Now to me that sounds like . . . if you're looking for security . . . the best way of doing it.

KELLY: I think so too.[49]

Amoroso then gave Kelly $25,000 in cash and Kelly stuffed the money into the pockets of his suit.[50]

Amoroso and Kelly then joined the others in the living room of the townhouse. As Ciuzio and the others were preparing to leave, he asked Amoroso who had the money. Amoroso replied, "He has it," and pointed to Kelly, who at that time was leaving the townhouse. Ciuzio responded that if Amoroso was satisfied, he was satisfied, and left.[51] Ciuzio, Kelly, Rosenberg and Weisz were then driven back to the Madison Hotel, where Kelly had left his car, and then to the Marriott, where Ciuzio, Rosenberg and Weisz were staying.[52]

---

**46.** *Id.* at 18, 21. Tr. at 650–52, 661–62, 679–80, 691–92, 740–41.

**47.** Transcript of Meeting of Jan. 8, 1980, at 22–23.

**48.** *Id.* at 24–26.

**49.** *Id.* at 26–27.

**50.** *Id.* at 28–30.

**51.** Tr. at 662–64, 707–10, 780–81. Weisz disputed this version of the events, testifying that he heard Ciuzio ask Amoroso, "Where's my money, where's my money?" Tr. at 1173–74. Weisz further testified that Ciuzio later asked him if he had the $25,000, to which he responded, "No." Tr. at 1175–76, 1280–81. On the other hand, Weinberg testified that Ciuzio, Rosenberg and Weisz each asked him if Kelly had been paid. Tr. at 958–60. Ciuzio did not testify at trial.

**52.** Tr. at 664, 1019–21, 1176–79. Weisz indicated that after the limousine dropped them at the Marriott, Ciuzio asked Rosenberg if he had the money, to which Rosenberg replied, "No." Ciuzio then purportedly said:

[T]hey didn't give me the money; Stan [Weisz], you haven't got the money; they surely didn't give any money to the Congressman; Rosenberg, you haven't got the money; I've been ripped off.

Tr. at 1179–80.

### 3. *Abscam's Payoff to Weisz*

On January 31, 1980, Rosenberg called Weisz and told him that Amoroso and Weinberg were in town and ready to pay them the balance of the $250,000. Rosenberg asked Weisz to call Weinberg because he wanted to know how the money should be split; according to Weisz, Rosenberg said that

> the split should be fifty for . . . Rosenberg, fifty for . . . [Weisz], fifty for . . . Ciuzio, and *seventy-five for Ciuzio to give to Kelly.*[53]

Weisz called Weinberg the next day and told him that the balance of the $250,000 should be split "fifty, fifty, fifty, seventy-five." [54] Weisz made it clear that Ciuzio should be given Kelly's share for delivery:

> WEINBERG: Hey now who, well who gets . . . Kelly's?
>
> WEISZ: Let Gino [Ciuzio] take care of it.
>
> WEINBERG: You want Gino to take care o' that?
>
> WEISZ: Absolutely.
>
> . . . .
>
> WEINBERG: [S]end a hundred and . . . twenty-five to Gino then.
>
> WEISZ: Right.
>
> WEINBERG: And he'll take care o' Kelly.
>
> WEISZ: That's the best way.[55]

Weisz agreed to meet Amoroso and Weinberg the next day to pick up his share of the money.[56]

On February 2, 1980, Weisz, accompanied by Rosenberg, drove to the Hilton Hotel at New York's Kennedy Airport to meet with Amoroso and Weinberg.[57] Amoroso told Weisz that the wealthy Arabs were pleased with the Kelly transaction and, indicating

that they "need[ed] a few [more] of these guys in our corner," asked Weisz if he had "anybody else in mind at this particular time?" [58] Weisz was agreeable to bringing additional people to the Abscam operatives:

> WEISZ: There's other ones, yes.
>
> AMOROSO: All right. How about the same arrangement?
>
> WEISZ: I don't see why not.
>
> AMOROSO: Okay.
>
> WEISZ: Seems satisfactory.
>
> . . . .
>
> WEISZ: If you wanna do exactly the same thing, I'll get you somebody else to do exactly the same thing.[59]

Weisz asked Weinberg to call Ciuzio and was surprised, but unconcerned, that Amoroso intended to deliver Kelly's $75,000 personally:

> AMOROSO: I got fifty for you, fifty for Bill [Rosenberg], and then we got fifty for Gino [Ciuzio].
>
> WEISZ: And you're gonna . . . deal direct with . . . Kelly?
>
> AMOROSO: Yeah.
>
> WEISZ: Ok . . . I see. . . . As long as he agrees . . . [t]hat's perfectly okay. I couldn't care one way or the other.[60]

At that point, Weisz received $50,000 and placed it in an attache case he had brought for that purpose.[61]

As Weisz left the meeting, he was met by two FBI special agents, Daniel Melore and Raymond Raleigh. Weisz accompanied the two agents to another room and answered their questions for about twenty minutes. Weisz related how he had participated with Ciuzio and Rosenberg in arranging Kelly's introduction to Amoroso and Weinberg, and stated that

---

**53.** Tr. at 1183–85 (emphasis added).

**54.** Transcript of Telephone Call of Feb. 1, 1980, at 1–2.

**55.** *Id.* at 2–3.

**56.** *Id.* at 3–4. Tr. at 1186.

**57.** Transcript of Meeting of Feb. 2, 1980, at 1, 6. Tr. at 1186.

**58.** Transcript of Meeting of Feb. 2, 1980, at 2, 5.

**59.** *Id.* at 2, 5.

**60.** *Id.* at 6–7.

**61.** *Id.* Tr. at 807, 822, 1190.

he knew full well that he was instrumental in bringing people together to be corrupted.[62]

Thereafter Weisz called his attorney and, after he arrived, the agents retrieved the $50,000 from Weisz's attache case and allowed Weisz to leave.[63]

## II. SELF-REPRESENTATION ISSUE

At the outset we are met by Ciuzio's contention that he was denied his constitutional right to dispense with the services of counsel and represent himself at his second trial. This contention· is based upon the district court's denial of a motion, filed by Ciuzio acting *pro se,* in which Ciuzio requested, *inter alia,* that the district court

> enter its Order allowing the defendant, CIUZIO, *to represent himself with assigned counsel, or in the alternative, Stand-by Counsel other than KARL PIL-GER.*[64]

Ciuzio asserts that the emphasized language "unequivocally" notified the district court that he wished to proceed *pro se.* Accordingly, since the district court interpreted Ciuzio's motion as a request to substitute an attorney of his own choice for Karl Pilger as appointed counsel, rather than as a request to proceed *pro se,* Ciuzio argues that the district court denied him the constitutional right of self-representation estab-

lished by the Supreme Court in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).[65]

■ We cannot agree with Ciuzio's assertion that his motion "unequivocally" requested that he be permitted to represent himself. Rather, considering the motion as a whole, as well as the contemporaneously filed motion for substitution of counsel, submitted on behalf of Ciuzio by Karl Pilger,[66] and·the record of Ciuzio's exercise of the right of self-representation at his first trial, we conclude that the district court properly interpreted Ciuzio's mótion as one for the substitution of alternative appointed counsel. Since at no point prior to his second trial did Ciuzio "articulately and unmistakably" assert his right to self-representation, *United States v. Bailey,* 675 F.2d 1292, 1300 (D.C.Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982), we find no constitutional error on the part of the district court.[67]

### A. The Right of Self-Representation

■ While it is well established that defendants in criminal actions may, under certain circumstances, waive their Sixth Amendment right to the assistance of counsel,[68] the Supreme Court has only recently held that the Sixth Amendment provides

**62.** Tr. at 807–09, 817–18, 823, 827, 830–32, 1069–70, 1072–74, 1190–92. Of course, at trial Weisz denied making the incriminating statement. Tr. at 1191, 1255.

**63.** Tr. at 819–20, 832, 1074–A, 1076, 1194–95, 1198–200, 1332–40.

**64.** Motion to Set Aside Order Allowing Assigned Counsel; Motion for Order Allowing Defendant, Ciuzio, to Have Counsel of His Own Choice ¶ 4, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. filed June 24, 1982) (emphasis added), Record Item (RI) 308 [hereinafter cited as Ciuzio Motion]. Karl Pilger, who acted as standby counsel for Ciuzio at his first trial, was appointed by the district court on June 11, 1982, to represent Ciuzio at his second trial. Status Call Transcript (Status Call Tr.) at 2–8. *See* Criminal Justice Act Appointment of Karl Pilger as Counsel for Eugene Ciuzio, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. June 15, 1982), RI 306.

**65.** Brief for Defendant Ciuzio at 16–17. *See* Order Denying Motion for Substitution of

Counsel, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. June 24, 1982), RI 309.

**66.** Motion of Defendant Eugene R. Ciuzio for Substitution of Counsel, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. filed June 21, 1982), RI 307 [hereinafter cited as Substitution Motion].

**67.** Ciuzio does not challenge the propriety of the district court's denial of his motion to replace Karl Pilger with appointed counsel of his own choice. *See* Order Denying Motion for Substitution of Counsel, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. June 24, 1982), RI 309.

**68.** *See, e.g., Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (waiver of right to assistance of counsel must be "an intentional relinquishment or abandonment of a known right or privilege").

defendants with the *right* to dispense with the services of counsel and represent themselves at trial.[69] *Faretta v. California, supra,* 422 U.S. at 818–21, 835–36, 95 S.Ct. at 2532–34, 2541–42. The Court found that a right of self-representation was implied by the language and history of the Sixth Amendment:

> The Framers selected in the Sixth Amendment a form of words that necessarily implies the right of self-representation. That conclusion is supported by centuries of consistent history.

*Id.* at 832, 95 S.Ct. at 2539. *See id.* at 818–19, 821, 95 S.Ct. at 2532–33, 2534. The Court recognized, however, that defendants' exercise of the newly defined constitutional right to proceed *pro se* would necessarily involve an abandonment of the explicit Sixth Amendment right to the assistance of counsel. Accordingly, the Court indicated that defendants should be permitted to exercise their right to represent themselves *only if* they execute a valid waiver of their right to the assistance of counsel; *i.e.,* only if they " 'knowingly and intelligently' forgo [the] relinquished benefits" of counsel. *Id.* at 835, 95 S.Ct. at 2541 (citing *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023–24, 82 L.Ed. 1461 (1938)).

■ Because the exercise of the right of self-representation necessarily involves a waiver of the preeminent right to the assistance of counsel,[70] the stringent limita-

tions established by the Supreme Court for waiver of the right to counsel necessarily define the requirements for exercise of the right of self-representation. Thus the Court's decisions establish that the mere failure of a defendant to request counsel will not result in a waiver of the right to counsel. *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). Since a defendant must act affirmatively to relinquish the right to counsel, it follows that the right of self-representation is waived if not asserted; for only if the defendant asserts the right to proceed *pro se* will it be possible for a court to find the requisite waiver of the right to counsel. *Brown v. Wainwright,* 665 F.2d 607, 610–11 (5th Cir.1982) (en banc); *United States v. Bennett,* 539 F.2d 45, 50 (10th Cir.), *cert. denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976).

■ Similarly, because the Supreme Court has enjoined courts to "indulge in every reasonable presumption against waiver" of the right to counsel, *Brewer v. Williams, supra,* 430 U.S. at 404, 97 S.Ct. at 1242, a defendant must *"articulately and unmistakably assert*[ ] his desire to avail himself of the constitutional right to self-representation . . . ." *United States v. Bailey, supra,* 675 F.2d at 1300 (emphasis added).[71] Given the strong presumption against waiver of the right to counsel, such a stringent standard for judging the ade-

---

**69.** Prior to *Faretta,* however, the Supreme Court had suggested that a right of self-representation was to be found in the Sixth Amendment. *See Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942) (in analysis of requirements for adequate waiver of Sixth Amendment right to counsel, Court refers to "the correlative right to dispense with a lawyer's help"). Furthermore, statutory protection of the right of self-representation in the federal courts predates the Sixth Amendment. *See* Judiciary Act of 1789, § 35, 1 Stat. 73, 92 (currently codified at 28 U.S.C. § 1654 (1976)). Similarly, most states have long provided defendants with the right to represent themselves in criminal cases. *Faretta v. California, supra,* 422 U.S. at 813–14 & nn. 9–11, 95 S.Ct. at 2530–31 & nn. 9–11.

**70.** *Faretta v. California, supra,* 422 U.S. at 832, 835, 95 S.Ct. at 2539, 2541; *Brown v. Wain-*

*wright,* 665 F.2d 607, 610 (5th Cir.1982) (en banc).

**71.** *Accord Brown v. Wainwright, supra,* 665 F.2d at 610 (demand must be "clear and knowing"); *United States v. Kennedy,* 564 F.2d 1329, 1340 (9th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978) (demand must be "unequivocal"); *United States v. Bennett, supra,* 539 F.2d at 50 (demand must be made "clearly and unequivocally"). Such standards find support in *Faretta,* where the Court, in holding that the defendant had adequately asserted his right to represent himself, stated that the defendant "clearly and unequivocally declared . . . that he wanted to represent himself and did not want counsel." *Faretta v. California, supra,* 422 U.S. at 835, 95 S.Ct. at 2541.

quacy of an assertion of the right of self-representation, involving as it does a waiver of the right to counsel, is entirely appropriate.

[A] court should not quickly infer that a defendant unskilled in the law has waived counsel and has opted to conduct his own defense.

*Brown v. Wainwright, supra,* 665 F.2d at 610. So also, a defendant who adopts equivocal positions regarding a request to proceed *pro se* may properly be held to have waived the right of self-representation. *Id.* at 611; *United States v. Bennett, supra,* 539 F.2d at 51.

■ In sum, defendants have a constitutional right derived from the Sixth Amendment to represent themselves at a criminal trial. However, because the exercise of that right requires waiver of the right to assistance of counsel,[72] the right of self-representation is waived unless defendants articulately and unmistakably demand to proceed *pro se.* Our task, therefore, is to determine whether Ciuzio presented the district court with an "articulate and unmistakable" demand to represent himself at his second trial. After a careful review of the record, we are convinced that he did not.

**B. *Ciuzio's Motion***

Ciuzio contends that he presented the district court with an unequivocal demand to represent himself at his second trial, relying *solely* on the following request contained in his motion filed *pro se* with the district court:

The defendant, CIUZIO, respectively requests that this Court enter its Order allowing the defendant, CIUZIO, to *rep-*

*resent himself* with assigned counsel, or in the alternative, Stand-by Counsel other than KARL PILGER.[73]

The district court treated Ciuzio's motion as one requesting it to replace Karl Pilger with an alternative assigned counsel of Ciuzio's choosing, and denied the motion.[74] We believe the district court correctly interpreted Ciuzio's motion as one for substitution of counsel.

The clear thrust of Ciuzio's motion was to substitute an attorney of his own choice, Orlando attorney Dennis Salvagio, for the attorney appointed by the district court, Karl Pilger. The motion averred that Ciuzio lacked confidence in Pilger and recited in considerable detail the reasons for his lack of confidence.[75] The motion recommended appointment of Salvagio, indicating that he was qualified and willing to serve as Ciuzio's counsel, provided that the district court authorized payment of attorneys' fees in excess of the maximum allowed by statute.[76] Asserting that the Constitution "mandates that a defendant in a criminal case is entitled to counsel of his own choosing," Ciuzio, in his prayer for relief, requested *only*

that this Court enter its Order Allowing the defendant Assigned Counsel of his own Choice . . . .[77]

Considering the motion as a whole, it was reasonable for the district court to interpret the language relied on by Ciuzio as indicating that Ciuzio wished to avail himself of the services of appointed counsel, but wished to substitute Salvagio for Pilger. Certainly Ciuzio's request "to represent himself *with assigned counsel . . . other*

---

**72.** Criminal defendants have no constitutional right to both self-representation *and* the assistance of counsel. *United States v. Halbert,* 640 F.2d 1000, 1009 (9th Cir.1981); *United States v. Trapnell,* 638 F.2d 1016, 1027 (7th Cir.1980).

**73.** Ciuzio Motion, *supra* note 64, ¶ 4 (emphasis added).

**74.** Order Denying Motion for Substitution of Counsel, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. June 24, 1982), RI 309.

**75.** Ciuzio Motion, *supra* note 64, ¶¶ 2, 3, 8, 9, 10. Ciuzio lacked confidence in Pilger because of Pilger's marriage to an attorney with the Criminal Division of the Department of Justice, and because of Pilger's attempts to withdraw from Ciuzio's representation because of financial hardship. *Id.* ¶¶ 2, 3, 9, 10.

**76.** *Id.* ¶¶ 5, 6, 7. Ciuzio also sought payment of Salvagio's expenses for travel to and living in Washington during the trial. *Id.* ¶ 6.

**77.** *Id.* ¶ 13.

*than KARL PILGER,*"[78] when made in the context of the described motion, fell far short of an unmistakable assertion that he wished to dispense with the services of counsel and proceed *pro se.*

We find additional support for the district court's view of Ciuzio's motion in the record of Ciuzio's exercise of his right of self-representation at his first trial. Prior to that trial, Ciuzio requested that the district court allow him to represent himself and submitted, *pro se,* a memorandum in support of his request.[79] In that memorandum, Ciuzio cited *Faretta* and stated correctly that

> [t]he right to represent oneself in conducting his own defense in a criminal case is established . . . by both the Sixth Amendment . . . as well as statute.[80]

Noting that he "ha[d] made an unequivocal request to represent himself" and was aware of "the disadvantages of proceeding to trial without counsel," Ciuzio asserted that the district court "must grant [his] motion to proceed pro se."[81] Concluding that, under the circumstances, it had "no alternative," the district court granted Ciuzio's request to represent himself.[82]

Without question, Ciuzio's memorandum in support of his request to proceed *pro se* at his first trial articulately and unmistakably asserted his right of self-representation. Thus, when considering the motion filed by Ciuzio prior to his second trial, the district court was necessarily aware that Ciuzio was capable of clearly asserting his right of self-representation if he wished to do so. That Ciuzio's motion made no reference to the constitutional right of self-representation, or to *Faretta,* was a telling indication that Ciuzio was not asserting his right to proceed *pro se.*[83]

There are other compelling indications that Ciuzio's motion was not intended to assert his right of self-representation. For example, although the district court granted Ciuzio's request to represent himself at his first trial, Ciuzio permitted Pilger, who had been appointed standby counsel, to conduct his entire defense.[84] This fact suggests that at some point Ciuzio reconsidered his decision to proceed *pro se* and decided to avail himself of the assistance of counsel, perhaps when confronted with the realities of a complex conspiracy trial.[85] Whatever

---

**78.** *Id.* ¶ 4 (emphasis added).

**79.** Transcript of Motions Hearing, Oct. 8, 1980, at 3–5; Transcript of Motions Hearing, Oct. 23, 1980, at 2–11; Transcript of Motions Hearings, Nov. 24, 1980, at 132–33. Memorandum of Law in Support of Defendant, Ciuzio's Position to Defend Pro Se, *United States v. Kelly, Ciuzio & Weisz,* No. 80–00340 (D.D.C. filed Oct. 23, 1980), RI 222 [hereinafter cited as Ciuzio Memorandum].

**80.** Ciuzio Memorandum, *supra* note 79, at 1. Ciuzio also indicated awareness of his right of self-representation in his discussions with the district court. Transcript of Motions Hearing, Oct. 23, 1980, at 3–6.

**81.** Ciuzio Memorandum, *supra* note 79, at 3.

**82.** Transcript of Motions Hearing, Nov. 24, 1980, at 132–33.

**83.** We do not mean to suggest that an explicit reference to the constitutional right of self-representation or, in particular, to *Faretta,* is necessary for defendants to unmistakably assert their right to proceed *pro se.* We simply conclude that where, as here, a defendant has demonstrated considerable familiarity with the right of self-representation, failure of such defendant to explicitly refer to that right in a subsequent motion justifies the inference that the defendant is not asserting his right of self-representation.

**84.** Our search of the record reveals only one occasion during the first trial when Ciuzio asserted his *pro se* status. Ciuzio requested and received modification of a protective order, which otherwise limited disclosure of certain FBI files to counsel, to permit *his* examination of those files. *Compare* Order, *United States v. Kelly, Ciuzio & Weisz,* No. 80–00340 (D.D.C. Jan. 5, 1981) (Ciuzio may examine FBI files) *with* Order, *United States v. Kelly, Ciuzio & Weisz,* No. 80–00340 (D.D.C. Jan. 2, 1981) (only counsel may examine FBI files).

**85.** That the district court was of the view that Ciuzio had abandoned his decision to proceed *pro se* and that Pilger had represented Ciuzio throughout the first trial is demonstrated by its order, issued subsequent to that trial, appointing Pilger as counsel for Ciuzio *nunc pro tunc* November 24, 1980, the date on which Ciuzio's request to represent himself had been granted. Criminal Justice Act Appointment of Karl Pilger as Counsel for Eugene Ciuzio, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C.

the reasons for Ciuzio's reliance on Pilger, the district court could properly consider his apparent abandonment of the right of self-representation at his first trial as an indication that Ciuzio's motion only requested to substitute appointed counsel. Likewise, the district court could look to the motion for substitution of counsel filed by Pilger on behalf of Ciuzio a mere three days prior to Ciuzio's motion [86] as a reliable statement of Ciuzio's wishes at the time. *Brown v. Wainwright, supra,* 665 F.2d at 611–12. Pilger's motion sought only to substitute Salvagio as Ciuzio's appointed counsel, and gave absolutely no indication that Ciuzio had any interest in representing himself.[87]

We therefore conclude that the record in this case overwhelmingly supports the district court's reading of Ciuzio's motion as a request for substitution of counsel. That interpretation results from a natural and reasonable construction of Ciuzio's motion, and is consistent with the clear import of the motion for substitution of counsel filed by Pilger, as well as the record of Ciuzio's exercise of his right of self-representation at his first trial. The language relied on by Ciuzio, when viewed in the context of this record, cannot reasonably be characterized as an "unequivocal" assertion of the right of self-representation.[88] Since Ciuzio failed to articulately and unmistakably assert his right to represent himself at his second trial, thereby waiving that right, we reject his contention that he was denied the right of self-representation.

## III. EVIDENTIARY ISSUES

### A. *Weisz' February 2 Statement to FBI*

As Weisz carried a briefcase containing $50,000 from his February 2, 1980 meeting with Amoroso and Weinberg at the Hilton Hotel, he was met by two FBI agents, Raleigh and Melore, who requested that Weisz accompany them to another room in the hotel.[89] In a statement allegedly given during subsequent questioning by the two agents, Weisz admitted

> that he knew full well that he was instrumental in bringing people together to be corrupted.[90]

Prior to trial, Weisz objected to the introduction of his statement, contending, *inter alia,* that it was obtained in violation of his right to assistance of counsel at a custodial interrogation.[91] *Edwards v. Arizona,* 451 U.S. 477, 482–85, 101 S.Ct. 1880, 1883–85, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 444–45, 473–76, 86 S.Ct. 1602, 1627–29, 16 L.Ed.2d 694 (1966). Weisz renews this objection on appeal, asserting that the district court committed reversible error by permitting Raleigh to testify to Weisz' statement.[92] We conclude that the district court properly allowed the government to adduce evidence of Weisz' statement.

Faced with Weisz' challenge to the admissibility of his statement, the government was required to prove by a preponderance of the evidence that Weisz knowingly and voluntarily waived the right to the assistance of counsel during custodial questioning.[93] *Edwards v. Arizona, supra,*

July 16, 1981), RI 280. *See* Transcript of Motions Hearing, Nov. 24, 1980, at 132–33.

86. Substitution Motion, *supra* note 66.

87. *Id.* Significantly, Pilger indicated that the purpose of Ciuzio's forthcoming *pro se* motion would be "to request a change of counsel . . . to permit his representation at trial by Dennis L. Salvagio, Esq." Affidavit of Karl W. Pilger, attached to Substitution Motion, *supra* note 66.

88. *See* Brief for Defendant Ciuzio at 16.

89. Transcript of Motions Hearing, July 22, 1982 (Afternoon), at 33–38, 44–45, 57–60, 65–66, 72 [hereinafter cited as *Miranda* Tr.]. Tr. at 807–09, 822–24, 1069–70, 1190–91, 1332.

90. Tr. at 818, 1074.

91. Motion to Suppress Evidence and, in the Alternative, for a Pre-Trial Hearing, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. filed July 12, 1982), RI 324. At trial Weisz also denied making the incriminating statement attributed to him. Tr. at 1255–58.

92. Brief for Defendant Weisz at 44–49.

93. *Miranda* and subsequent decisions establish beyond question that if an
> individual states that he wants an attorney, the interrogation must cease until an attorney is present.

451 U.S. at 482, 101 S.Ct. at 1883; *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979); *Lego v. Twomey,* 404 U.S. 477, 487–89, 92 S.Ct. 619, 625–26, 30 L.Ed.2d 618 (1972); *United States v. Hackley,* 636 F.2d 493, 500 (D.C.Cir.1980); *United States v. Glover,* 596 F.2d 857, 865 (9th Cir.), *cert. denied,* 444 U.S. 857, 860, 100 S.Ct. 117, 124, 62 L.Ed.2d 76 (1979). In reviewing the district court's ruling that the government had met this burden, we are not bound by the district court's conclusions of law and must determine whether it applied the correct rule of law to the facts of the case. However, we must accept the district court's resolution of factual questions unless clearly erroneous. *United States v. Saimiento-Rozo,* 676 F.2d 146, 150 (5th Cir.1982); *United States v. Hinckley,* 672 F.2d 115, 119 (D.C.Cir.1982) (per curiam); *United States v. Glover, supra,* 596 F.2d at 865.

The admissibility of Weisz' statement turned on the district court's resolution of a factual dispute between Weisz and the FBI agents regarding the course of events which culminated in Weisz' statement. According to Weisz, when he reached the other hotel room the agents told him that he was "in very deep trouble" and asked him to read a "detailed," "heavy sort of a document" which outlined his "rights." After he had read the document, the agents demanded that he sign it; Weisz refused:

> I said, no way. I won't sign it. I won't sign anything without my lawyer, and *I want my lawyer.*[94]

Despite his clear request for his attorney, the agents persisted in questioning him regarding his role in Kelly's introduction to Amoroso and Weinberg.[95] On the other hand, according to the FBI agents, when Weisz arrived at the second room he was given an "Advice of Rights" form, which he read, and was asked to sign the waiver at the bottom of the form. Weisz responded that he understood his "Miranda" rights and that he was willing to answer the agents' questions, but that he preferred not to sign the waiver.[96] The agents then proceeded to question Weisz for approximately twenty minutes, during which time Weisz made the incriminating statement. Shortly thereafter, according to the agents, Weisz first asked to speak to his attorney and all questioning by the agents stopped.[97]

In ruling that Weisz' statement was admissible, the district court accepted the FBI agents' version of their questioning of Weisz, and concluded that their testimony demonstrated that Weisz had waived his right to assistance of counsel prior to questioning.[98] The agents' version was corroborated by handwritten notes taken by both agents during the questioning of Weisz.[99] On this record we cannot say that it was clearly erroneous for the district court to credit the agents' version of the questioning over that offered by Weisz.[100]

Having so resolved this crucial factual dispute, the district court was certainly correct in concluding that Weisz had effectively waived his right to have an attorney present during questioning. That Weisz declined to sign the proffered waiver form is not determinative of the waiver question; "[a]n express written ... statement of waiver of ... the right to counsel ... is not inevitably either necessary or sufficient to establish waiver." *North Carolina v.*

---

*Miranda v. Arizona, supra,* 384 U.S. at 474, 86 S.Ct. at 1627. *Accord Edwards v. Arizona, supra,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85; *United States v. Hinckley,* 672 F.2d 115, 122 (D.C.Cir.1982) (per curiam).

**94.** Tr. at 1191–92 (emphasis added). *See Miranda* Tr. at 8.

**95.** *Miranda* Tr. at 9. Tr. at 1192–96.

**96.** *Miranda* Tr. at 10, 39–41, 60–61, 72–73. Tr. at 809–10, 827, 1070–72.

**97.** *Miranda* Tr. at 10–11, 41–42, 62–64, 75–76. Tr. at 810, 817–18, 827, 1072–74–A, 1077.

**98.** *Miranda* Tr. at 84–85.

**99.** *Miranda* Tr. at 53–54, 62. Tr. at 810–11, 815–16, 829–30, 841–43, 1072–73, 1077–84.

**100.** *Accord United States v. Phillips,* 640 F.2d 87, 93–94 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981); *United States v. Durham,* 587 F.2d 799, 801 (5th Cir. 1979).

Butler, supra, 441 U.S. at 373, 99 S.Ct. at 1757. Accord United States v. Stewart, 585 F.2d 799, 800 (5th Cir.1978) (per curiam), cert. denied, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979); United States v. Cooper, 499 F.2d 1060, 1062–63 (D.C.Cir.1974). As we recognized several years ago,

> [i]t is ... a common experience of life that in many circumstances persons are willing to convey information orally but are reluctant to put the same thing in writing.

United States v. Cooper, supra, 499 F.2d at 1062.[101] Here Weisz, a mature, well-educated accountant,[102] having read an "Advice of Rights" form, unequivocally stated that he understood his Miranda rights and expressly agreed to answer the FBI agents' questions. On these facts, we have no difficulty concluding that Weisz waived his right to counsel prior to the start of the agents' questioning. Accordingly, the incriminating statement elicited by the FBI agents during their questioning of Weisz was properly admitted by the district court. We reject Weisz' contention to the contrary.

### B. Kelly's January 8 Meeting with Amoroso

On the evening of January 8, 1980, Kelly met privately with Amoroso in the library of Abdul Enterprises' Washington, D.C., townhouse. They discussed the assistance required by the wealthy Arabs and the investments the Arabs planned to make in order to protect their "friends" in Congress. Toward the end of the meeting, after agreeing to help the Arabs with their immigration difficulties, Kelly accepted $25,000 from Amoroso and stuffed the cash into the pockets of his suit.[103] Unbeknownst to Kelly and the others, the FBI recorded the meeting on video tape.

Prior to trial, Ciuzio and Weisz objected to the introduction of the FBI video tape of the meeting. Both contended that the "probative value [of the video tape was] substantially outweighed by the danger of unfair prejudice," Fed.R.Evid. 403, because the sight of a United States Congressman stuffing $25,000 into his pockets would so inflame the jury that it would convict those associated with Kelly irrespective of the evidence.[104] Ciuzio objected to the playing of the entire video tape,[105] while Weisz

---

**101.** Cooper is virtually indistinguishable. In that case, four FBI agents investigating a bank robbery confronted Cooper and asked to speak to him. After reading an "Advice of Rights" form, Cooper stated that he understood his rights. When asked to sign the waiver on the form, Cooper declined, but indicated that he wanted to answer the FBI agents' questions. During the subsequent questioning, Cooper made several damaging statements. United States v. Cooper, supra, 499 F.2d at 1061–62. Noting, inter alia, that Cooper was well educated, we rejected his claim that the statements were obtained in violation of his Miranda rights, and held his statements admissible. Id. at 1062–63.

**102.** Tr. at 1098–99.

**103.** See Part I.B.2. supra.

**104.** Motion to Suppress Evidence and, in the Alternative, for a Pre-Trial Hearing, United States v. Ciuzio & Weisz, No. 80–00340 (D.D.C. filed July 12, 1982), RI 324; Motion of Defendant Ciuzio to Suppress Evidence of January 8, 1980 Meeting Between FBI Agent Amoroso and Richard Kelly, United States v. Ciuzio & Weisz, No. 80–00340 (D.D.C. filed July 9, 1982), RI 322. Transcript of Motions Hearing, July 22, 1982 (Morning), at 48–49, 53 [hereinafter cited

as Motions Tr.]. Ciuzio also objected to the introduction of the video tape on the grounds that (1) the events which occurred at the meeting were the product of governmental misconduct violative of due process and, therefore, evidence of the meeting was inadmissible; and (2) Kelly's statements at the meeting were not "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy," Fed.R.Evid. 801(d)(2)(E), and, therefore, were inadmissible hearsay. Motion of Defendant Ciuzio to Suppress Evidence of January 8, 1980 Meeting Between FBI Agent Amoroso and Richard Kelly, United States v. Ciuzio & Weisz, No. 80–00340 (D.D.C. filed July 9, 1982), RI 322. Motions Tr. at 50–52. Ciuzio renews these objections on appeal, Brief for Defendant Ciuzio at 22–31, 36–43, and we address them infra. See Parts III.C. & V. infra.

**105.** Ciuzio was of the view that if any portion of the video tape was admitted, then the entire tape should be admitted. Motions Tr. at 48–49. Ciuzio's defense was that he never intended to have Kelly receive any money, but rather that he intended to take Abscam's money for himself. Tr. at 576–81. Ciuzio agreed with the district court's view that the video tape showed lack of preparation. A man comes in with just a suit jacket and he's going to stuff

sought principally to have the offensive "money stuffing" scene redacted from the tape.[106] The district court concluded that the video tape had considerable probative value, but was concerned that the money stuffing scene added nothing to the government's case.[107] Noting that "[t]o see a Congressman stuffing any amount of money in his pockets is a disgusting, revolting sight," the district court suggested that "the prejudice [of the money stuffing scene] far outweighs the probative value."[108] Nevertheless, the district court reserved its ruling on the admissibility of the money stuffing scene and, at trial, permitted the entire video tape to be played for the jury.[109]

 Ciuzio and Weisz now contend that the district court's admission of the video tape of the Kelly-Amoroso meeting was reversible error, once again arguing that the probative value of the tape was outweighed by the prejudice associated with the money stuffing scene. However, the balancing of probative value against potential for unfair prejudice called for by Fed.R.Evid. 403 is a task committed to the sound discretion of the district court; its decision will not be disturbed on appeal except for *grave abuse. United States v. Allen,* 629 F.2d 51, 58 (D.C.Cir.1980); *United States v. Day,* 591 F.2d 861, 878 (D.C.Cir. 1978); *United States v. Wright,* 489 F.2d 1181, 1186 (D.C.Cir.1973). We cannot say that the district court abused its discretion in allowing the government to play the entire video tape for the jury.

The probative value of the video tape of Kelly's meeting with Amoroso, including the money stuffing scene, cannot be gainsaid. The meeting provided direct evidence of Kelly's relationship with Ciuzio when, during the meeting, Kelly asked to talk to Ciuzio and later requested that Amoroso "deal with Gino [Ciuzio] about" Kelly's $25,-000.[110] The video tape itself allowed the jury the unique opportunity to observe Kelly's demeanor as Amoroso explained and Kelly accepted the obviously corrupt proposal. Kelly registered no surprise or protest during Amoroso's discourse, but rather demonstrated familiarity with the proposal by revealing that he understood the purpose for the Arabs' investments in his district.[111] When Amoroso offered the $25,000 in cash, Kelly calmly stuffed the five packets of bills into his suit, all the while continuing his conversation with Amoroso about a possible investment for the Arabs in Florida.[112] These facts indicate that Kelly was already familiar with the proposal, *i.e.,* that Ciuzio had explained the Arabs' proposal to Kelly prior to January 8. Finally, the video tape was irrefutable evidence that Kelly had, in fact, been bribed, thus proving one element of the aiding and abetting charge lodged against Ciuzio and Weisz. *See United States v. Staten,* 581 F.2d 878, 886–87 (D.C. Cir.1978).

 Nor can we agree that Ciuzio and Weisz were *unfairly* prejudiced by the district court's admission of the video tape. The tape, after all, simply permitted the jury to see the commission of the very

---

twenty-five thousand dollars in his pocket. That doesn't show that he came prepared to take any money.
Motions Tr. at 48–49.

**106.** Motions Tr. at 53. To avoid playing the money stuffing scene for the jury, Weisz offered to "stipulate that Kelly took the money." *Id.* The government insisted on proving that Kelly had accepted the $25,000, as was its right. *United States v. Caldwell,* 543 F.2d 1333, 1359 n. 134 (D.C.Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (party not required to accept judicial admission of opponent, but rather may insist on proving fact); *United States v. Cockerham,* 476 F.2d 542, 545 (D.C.Cir.1973) (per curiam)

(defendant has no right to require government to stipulate facts with inflammatory impact).

**107.** Motions Tr. at 36–37, 41–42, 44–45, 48, 52.

**108.** Motions Tr. at 36, 42, 52.

**109.** Motions Tr. at 52, 54. Tr. at 658.

**110.** Transcript of Meeting of Jan. 8, 1980, at 21–23. *See* text at notes 46–47 *supra.*

**111.** Transcript of Meeting of Jan. 8, 1980, at 12–15. *See* text at notes 43–44 *supra.*

**112.** Transcript of Meeting of Jan. 8, 1980, at 28–30.

crime which Ciuzio and Weisz were charged with assisting and conspiring to commit. While such direct evidence of crime is certainly prejudicial to a defendant's case, without more it is not *unfairly* so. *United States v. Day, supra,* 591 F.2d at 878; Fed. R.Evid. 403. Ciuzio and Weisz argue that the visually recorded evidence of Congressman Kelly selling his office would so influence some jurors that they would be incapable of rendering an objective verdict. However we believe it more likely that jurors would correctly find such evidence to be strongly probative of guilt. Furthermore, we suspect that viewing Kelly's acceptance of the money on the video tape, as opposed to hearing a stipulation of that fact as suggested by Weisz,[113] could create little incremental unfair prejudice since jurors would have learned of Kelly's misdeed in either case.

█ In any event, whatever potential for unfair prejudice that might have inhered in the money stuffing scene was dissipated by the district court's careful voir dire of the prospective jurors. The district court described to each prospective juror the conduct alleged by the government and asked each whether the nature of that conduct or, in particular, the sight of a Congressman accepting $25,000 would so offend them that they would find all those persons associated with the Congressman guilty.[114] In at least one instance, a prospective juror responded positively and was excused for cause.[115] We have previously recognized the value of voir dire as a means to identify prospective jurors who might be prejudiced against a defendant by the nature of evidence to be presented at trial, *United States v. Chapin,* 515 F.2d 1274, 1284–85 (D.C.Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975), and we again commend the practice to the district courts. Here, the district court's exhaustive voir dire permitted the parties to assemble a jury not likely to be *unfairly* prejudiced by the sight of Kelly accepting $25,000 from Amoroso. Accordingly, given the very considerable evidentiary value of the video tape of Kelly's meeting with Amoroso, we are of the opinion that the district court did not abuse its discretion in allowing the entire video tape into evidence.[116]

## C. *Statements of Co-Conspirators*

Throughout the Abscam investigation, the FBI recorded numerous telephone calls and meetings involving, *inter alia,* Ciuzio, Kelly and Weisz. These audio and video recordings provided the bulk of the evidence against Ciuzio and Weisz.[117] Prior to trial, Ciuzio sought to suppress a number of these recordings, arguing that the statements of Kelly and Weisz contained therein were inadmissible hearsay. Ciuzio contended that there was not "substantial independent evidence" of a conspiracy and his participation therein to permit admission of the statements as "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R. Evid. 801(d)(2)(E).[118] The district court ad-

113. Motions Tr. at 53. *See* note 106 *supra.*

114. *See, e.g.,* Tr. at 46–47, 60–61, 68–69, 115–16, 121–22, 125–26, 137–38, 146–47, 151–53, 163–64, 169–70. Voir dire consumed three days at trial. Tr. at 1–529.

115. Tr. at 113–14.

116. No extended discussion is required to dispose of Ciuzio's contention that the district court erred in admitting the long-distance telephone toll records of Ciuzio, Kelly and Weisz to show "contacts" between the phones of the co-conspirators. Brief for Defendant Ciuzio at 32–35. At trial, Ciuzio argued that the records merely showed

> contact between certain telephones and not certain people. And an inference has to be

made that there was a conversation between these people and then an inference on top of that [as to the subject matter of the conversation].

Tr. at 858. We agree with the district court that "in the context of [the government's] evidence" the necessary inferences were not "so wild and speculative" as to require exclusion of the telephone records. Tr. at 858–59.

117. Tr. at 644–48, 652–58, 665–67, 725, 728–30, 746, 782–84, 962, 964–69, 985–87, 989–92, 1002–03.

118. Motion of Defendant Ciuzio to Suppress Hearsay Statements of Alleged Coconspirators, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. filed July 9, 1982), RI 317. *See* note 104 *supra.*

mitted the statements, finding that the government had demonstrated "some community of purpose" among Ciuzio, Kelly, Rosenberg and Weisz, and had no problem showing what that purpose was—"the community of purpose was to bribe a Congressman."[119]

Ciuzio now contends that the district court applied an erroneous legal standard in deciding whether to admit the statements of Kelly and Weisz as evidence against Ciuzio. Ciuzio asserts that the out-of-court statements of his alleged coconspirators were admissible against him under Rule 801(d)(2)(E) only if the district court found substantial independent evidence of a conspiracy, *i.e.*, an *unlawful* combination. Since, according to Ciuzio, the district court only found a "community of purpose" and there was no independent evidence that that purpose was unlawful, Ciuzio concludes that it was reversible error for the district court to admit the statements.[120] We cannot agree that the questioned evidence was improperly admitted.

Fed.R.Evid. 801(d)(2)(E) embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are not hearsay and are admissible against the others, if made in furtherance of the common goal. The doctrine, applicable in both civil and criminal cases, whether or not a conspiracy is charged, is founded on concepts of agency and partnership law:

> [W]hen any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is

the act of all, and is admissible as primary and original evidence against them.

*Hitchman Coal & Coke Co. v. Mitchell,* 245 U.S. 229, 249, 38 S.Ct. 65, 72, 62 L.Ed. 260 (1917). *See United States v. Jackson,* 627 F.2d 1198, 1214–16 (D.C.Cir.1980); *United States v. Trowery,* 542 F.2d 623, 626–27 (3d Cir.1976) (per curiam), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977).

Although Rule 801(d)(2)(E) refers to "conspiracy" and statements of a "coconspirator," its use of those terms is not intended to limit applicability of the doctrine to unlawful combinations; "the [R]ule is meant to carry forward the universally accepted doctrine that a *joint venturer* is considered as a coconspirator for the purpose of this [R]ule even though no conspiracy has been charged." Fed.R.Evid. 801(d)(2)(E) Senate committee note (emphasis added). *United States v. Trowery, supra,* 542 F.2d at 626. Likewise, although the cases state that the doctrine is available only if "there is substantial evidence, independent of [the statements at issue] that . . . a conspiracy existed," *United States v. Gantt,* 617 F.2d 831, 844 (D.C.Cir.1980),[121] the term "conspiracy," when used in this context, does not, as Ciuzio suggests, refer solely to unlawful combinations:

> [I]t is not necessary to show by independent evidence that the combination was criminal or otherwise unlawful. The element of illegality may be shown by the declarations themselves.

*Hitchman Coal & Coke Co. v. Mitchell, supra,* 245 U.S. at 249, 38 S.Ct. at 72. *Accord United States v. Jackson, supra,* 627 F.2d at 1216. Ciuzio's contention to the contrary— *i.e.,* that admissibility of coconspirator statements turns on proof by substantial independent evidence of an *unlawful* combi-

---

**119.** Motions Tr. at 33–34.

**120.** Brief for Defendant Ciuzio at 36–43.

**121.** *Accord United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974); *United States v. Nicoll,* 664 F.2d 1308,

1311 (5th Cir.), *cert. denied,* 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982); *United States v. Jackson, supra,* 627 F.2d at 1219; *United States v. Slade,* 627 F.2d 293, 307 (D.C. Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980).

nation—is simply not in accord with the law of this Circuit.[122]

 Nor is it clear, as Ciuzio asserts, that the district court failed to find an *unlawful* "community of purpose" among Ciuzio and his alleged coconspirators. The district court seemingly found that the government could show that Ciuzio, Weisz and the others were acting in concert toward an unlawful goal when it concluded that the government had no problem showing that their "community of purpose was to bribe a Congressman."[123] There is certainly substantial evidence in the record, in addition to statements by Ciuzio's coconspirators, to support the district court's conclusion. For example, Ciuzio told Amoroso and Weinberg at their December 19, 1979 meeting that he and Weisz had discussed the Arabs' proposal and decided that Kelly should receive $100,000 of the $250,000 fee because "that['s] what he needs to straighten his whole life out."[124] Later, stating that he was "obligated to protect" Kelly because "once you give em money ya . . . compromise him," Ciuzio agreed to "lay out the story" for Kelly after he received "clearance" from Weisz.[125] These facts suggest that Ciuzio was working closely with Weisz to arrange payment of a $100,000 bribe to Kelly.

In addition, Ciuzio indicated that he had explained the proposal to Kelly and that Kelly had left the arrangements to him.[126] Having agreed to "lay out the story" for Kelly, Ciuzio asked Kelly to call him from a "public phone booth," rather than from his congressional office, to discuss the transaction.[127] The next day, Ciuzio told Weinberg that he had, in fact, spoken with Kelly and that Kelly was available for a meeting on January 8, 1980.[128] Ciuzio, Kelly, Rosenberg and Weisz subsequently arrived together at Abdul Enterprises' townhouse for the meeting with Amoroso and Weinberg.[129] That Ciuzio wanted to use an "outside call"[130] to discuss the Arabs' proposal with Kelly is strong evidence that Ciuzio was concerned that the subject matter of their conversation not be overheard by anyone in Kelly's office. These facts suggest that Ciuzio *fully* explained the Arabs' corrupt proposal to Kelly and was working with Kelly to arrange the bribe. Thus there is substantial independent evidence in the record to support a conclusion that Ciuzio was acting in concert with Kelly and Weisz to arrange Amoroso's payment of a bribe to Kelly.

In sum, we reject both the legal and factual predicates of Ciuzio's argument. Under Fed.R.Evid. 801(d)(2)(E), the out-of-court statements of Kelly and Weisz were admissible against Ciuzio upon a showing, by substantial evidence independent of those statements that Ciuzio, Kelly and Weisz were engaged in a common enterprise. Proof by substantial independent evidence that the enterprise was unlawful was not required. *Hitchman Coal & Coke Co. v. Mitchell, supra,* 245 U.S. at 249, 38 S.Ct. at 71; *United States v. Jackson, supra,* 627 F.2d at 1216. Furthermore, we find that the district court did, in fact, conclude that there was substantial inde-

---

**122.** Indeed, Ciuzio appeared to recognize this fact in his motion to suppress the co-conspirator statements:

[I]t is not necessary to show in this jurisdiction that a conspiracy or "combination" had an *unlawful* purpose . . . .

Motion of Defendant Ciuzio to Suppress Hearsay Statements of Alleged Coconspirators 3, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. filed July 9, 1982), RI 317.

**123.** Motions Tr. at 34. Ciuzio cannot be heard to fault the district court for failing to state its finding with more precision; Ciuzio's counsel declined an offer to be heard on the question shortly after the district court reached its conclusion. Motions Tr. at 35.

**124.** Transcript of Meeting of Dec. 19, 1979, at 17.

**125.** *Id.* at 18–19, 23–24, 33–34.

**126.** *Id.* at 16, 26, 30, 35.

**127.** Transcript of Telephone Call of Dec. 20, 1979, at 2, 8, 10.

**128.** Transcript of Telephone Call of Dec. 21, 1979, at 3.

**129.** Tr. at 1015–17, 1168.

**130.** Transcript of Telephone Call of Dec. 20, 1979, at 8.

pendent evidence that Ciuzio, Kelly and Weisz were engaged in a common enterprise, and that the goal of that enterprise was the bribery of the Congressman. On the basis of this finding, the district court admitted the ʿ out-of-court statements of Kelly and Weisz as evidence against Ciuzio.[131] Our review of the record reveals no error on the part of the district court in admitting these statements.[132]

### D. *Failure to Record Conversations*

One of the many noteworthy aspects of the Abscam investigation was the FBI's extensive use of audio and video recording equipment to create a record of conversations between the Abscam operatives and individuals under investigation. Weinberg was instructed to record all of his Abscam-related telephone conversations and, insofar as was possible, meetings were arranged to be held in locations where the FBI could video tape the proceedings.[133] On a few occasions, however, Weinberg and the FBI

did not record significant conversations with targets of the Abscam investigation.[134]

Weisz now contends that the FBI's failure to record or otherwise memorialize *all* conversations during the Abscam investigation deprived him of a fair trial and violated principles of due process. Weisz notes that no recording was made of his December 21, 1979 telephone conversation with Weinberg[135] or of his February 2, 1980 questioning by the FBI.[136] Furthermore, no FBI Form 302 was prepared memorializing the substance of his conversation with Weinberg.[137] Relying on our seminal decision in *United States v. Bryant,* 439 F.2d 642 (D.C.Cir.1971), Weisz asserts that the FBI's failure to "preserve" these allegedly exculpatory conversations requires reversal of his conviction. We find this argument to be wholly without merit.

Weisz' reliance on *Bryant* and subsequent cases requiring government *preservation* and production at trial of notes, tapes, and other evidence created during an investigation is inapposite.[138] In *Bryant,* an FBI

131. Motions Tr. at 33–34. However, the district court instructed the jury that it could not consider the statements of Kelly and Weisz as evidence against Ciuzio

unless and until it is established to your satisfaction beyond a reasonable doubt that a conspiracy existed and that the defendant was one of its members.

Tr. at 1554–55.

132. We also find untenable Ciuzio's contention that the statements of his alleged co-conspirators were inadmissible against him because he had withdrawn from the conspiracy during his exchange with Weinberg on January 8, 1980. Brief for Defendant Ciuzio at 29–30. *See* text at notes 41–42 *supra.* We cannot say that Ciuzio acted affirmatively to disavow the purpose of the conspiracy when, during that exchange, he continued to support an indirect payment to Kelly and, subsequently, he conversed with Kelly during the course of Kelly's meeting with Amoroso. *See United States v. Borelli,* 336 F.2d 376, 388 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

133. Tr. at 638–39, 725, 728, 962, 985. The Abscam investigation generated over a thousand recorded conversations, the majority of which were telephone conversations involving Weinberg. Tr. at 784.

134. Weinberg testified that he was unable to record telephone conversations if someone un-

aware of the Abscam investigation was present. Tr. at 990–92, 1008. Weinberg also indicated that occasionally he did not have his recording equipment, or tapes therefor, available to record a conversation. Tr. at 990–92, 1008.

135. *See* note 39 *supra.*

136. *See* text at notes 62–63, 94–97 *supra.* Tr. at 824.

137. Tr. at 727–31, 783. An FBI Form 302 was prepared summarizing the FBI's questioning of Weisz on February 2. Tr. at 815–16, 1077–84. We reject Weisz' suggestion that a failure to comply with FBI regulations, which, according to Weisz, required preparation of an FBI Form 302 on Weinberg's conversation with Weisz, can require reversal of a conviction. *Cf. United States v. Caceres,* 440 U.S. 741, 754–57, 99 S.Ct. 1465, 1472–74, 59 L.Ed.2d 733 (1979) (mere violation of agency regulations is not grounds for exclusion of evidence). *See* Brief for Defendant Weisz at 57.

138. *See United States v. Peters,* 587 F.2d 1267, 1275 (D.C.Cir.1978) (transcript of grand jury testimony); *United States v. Harrison,* 524 F.2d 421, 423 (D.C.Cir.1975) (rough notes of FBI agent); *United States v. Butler,* 499 F.2d 1006, 1007 (D.C.Cir.1974) (results of urine test);

agent tape recorded a critical meeting between undercover agents and the defendant, but made no effort to preserve the tape because he "had never intended the tape to be used as evidence at trial." *Id.* at 645–47. Thus we were required to consider

> the legal consequences of *intentional non-preservation by investigative officials of highly relevant evidence. . . .*

*Id.* at 647 (emphasis added). Concerned that decisions made by investigative personnel to dispose of evidence could, if uncontrolled, subvert the integrity of the criminal process, we held that the constitutional and statutory

> duty of disclosure attaches in some form *once the Government has first gathered and taken possession of the evidence* in question. Otherwise, disclosure might be avoided by *destroying vital evidence* before prosecution begins or before defendants hear of its existence. . . . [B]efore a request for discovery has been made, the duty of disclosure is operative as a duty of preservation.

*Id.* at 644, 651 (footnote omitted) (emphasis added). Accordingly, we required the government to implement and

> follow rigorous and systematic procedures designed to preserve *all discoverable evidence gathered in the course of a criminal investigation.*

*Id.* at 652 (footnote omitted) (emphasis added).

■ Nothing in *Bryant* suggests that the FBI was obligated to *create* documentary evidence of its conversations with Weisz. The clear thrust of that decision is to require the government to preserve *discoverable evidence once such evidence is created or uncovered* by its investigative activities. But a conversation is not "discoverable," at

least in the sense that that term is generally used in the adversary process; it is only such notes, memoranda, and recordings of the conversation as may be prepared by the government that are discoverable.[139] Since the *Bryant* "duty of preservation" does not attach *unless and until* such discoverable materials come into existence, *id.* at 651–52, the FBI was under no duty to "preserve" its conversations with Weisz by recording or otherwise memorializing them.[140]

This interpretation of *Bryant* is supported by our subsequent decision in *United States v. Butler,* 499 F.2d 1006 (D.C.Cir. 1974). In that case the defendant sought to discover the results of a blood alcohol test allegedly performed on a sample of his urine taken by the police. Although the government acknowledged that the urine sample had been taken, it was unable to find any record indicating that the blood alcohol test had, in fact, been performed. *Id.* at 1007. Although we concluded that under *Bryant* the government was required to preserve the results of such a test, if performed, we held that if

> a sample of [the defendant's] urine was taken . . . [but] no test was made, *that would end the matter,* and the judgment of conviction would remain undisturbed.

*Id.* at 1007–08 (emphasis added). Clearly, we concluded in *Butler* that *Bryant* imposed no obligation on the government to perform the blood alcohol test and create the evidence sought by the defendant; rather, we found that *Bryant* only required the government to preserve the test results *if* it chose to perform the test. Likewise, we conclude that *Bryant* did not require the FBI to record its conversations with Weisz and thereby create the documentary evidence sought by Weisz.

---

*United States v. Patterson,* 495 F.2d 107, 112–13 n. 7 (D.C.Cir.1974) (results of fingerprint investigation); *United States v. Bundy,* 472 F.2d 1266, 1267 (D.C.Cir.1972) (per curiam) (rough notes of police officer); *United States v. Bryant, supra,* 439 F.2d at 652–53 (tape recording of meeting with defendant). *Compare United States v. Ferguson,* 498 F.2d 1001, 1005–06 (D.C.Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 145 (1974) (Court de-

clines to extend *Bryant* rationale to disappearance of informant whose identity was known only to the government).

**139.** Of course, the substance of a conversation may be "discovered" by questioning the participants therein.

**140.** *See* Brief for Defendant Weisz at 54–55.

Weisz also suggests that we must *require* the FBI to record all conversations with individuals under investigation because otherwise the

temptation for the government to record only conversations that are favorable to it becomes overwhelming.[141]

Initially, we are at a loss to understand how the FBI could "successfully" succumb to the temptation described by Weisz. Prior to the start of a conversation, when the decision to record would have to be made, the FBI could only speculate whether the content of the conversation would be "favorable." [142] If the FBI were to record all conversations and then retain only "favorable" conversations, its conduct would fall squarely within the prohibition of *Bryant.*

■ In any event, we do not believe that judicial intervention is necessary to encourage the FBI to record, whenever possible, its conversations with persons under investigation. We think it obvious that the FBI, in its efforts to discover and develop evidence for use at criminal trials, has every incentive to gather that evidence in the most reliable and persuasive form. That this is, in fact, the case is amply demonstrated by the Abscam investigation, where the FBI, under no compulsion from the judiciary, recorded virtually all of its hundreds of telephone calls and meetings with individuals under investigation.[143] Under these circumstances there is simply no need for a judicial requirement that the FBI record all conversations with the targets of

its investigations. Accordingly, we decline Weisz' invitation to fashion a constitutionally based obligation on the part of law enforcement officials to record or otherwise memorialize all conversations with persons suspected of criminal activity.

### IV. THE MOTIONS FOR JUDGMENT OF ACQUITTAL

At the close of the government's case, and again at the close of all of the evidence, Ciuzio and Weisz moved for judgments of acquittal, contending that there was insufficient evidence in the record to support convictions on the charges brought by the government. The district court summarily denied their motions.[144] Ciuzio and Weisz renew these contentions on appeal, arguing principally that the evidence was insufficient to permit the jury to conclude, beyond a reasonable doubt, that they possessed the requisite intent to participate in Amoroso's bribery of Kelly.

■ Our task in reviewing the district court's denial of the motions for judgment of acquittal is identical to that of the district court in considering the motions in the first instance. We must determine whether, viewing the evidence most favorably to the government and according the government the benefit of all legitimate inferences therefrom, a reasonable juror *must necessarily* have had a reasonable doubt as to the defendants' guilt. *United States v. Singleton,* 702 F.2d 1159, 1162–63

---

141. *Id.* at 56.

142. We take considerable exception to the underlying premise of Weisz' argument, *i.e.,* that the FBI would, absent judicial supervision, conceal or destroy exculpatory evidence in order to obtain convictions of those it suspected of criminal activity. *See id.*

143. Tr. at 638–39, 725, 728, 784, 962, 985. The FBI failed to record only one significant conversation during its investigation of Kelly and his associates, the five minute telephone conversation between Weinberg and Weisz on December 21, 1979. Weinberg testified that he could not record the call because someone unaware of the Abscam investigation entered the room where he was making the call. Amoroso testified that he did not prepare an FBI Form 302 on the conversation because Weinberg told him

that it only involved arrangements for the January 8, 1980 meeting. Tr. at 729–34, 783, 984–85, 992, 1139, 1268. One other conversation—an eleven minute telephone conversation between Weinberg and Ciuzio on December 18, 1979—was not recorded; however, the substance of that conversation was brought out in the recorded meeting between Ciuzio and the Abscam operatives the following day. Tr. at 729, 746, 782–83, 884–86. As can be seen, the FBI operatives successfully recorded the vast majority of their communications with Ciuzio, Weisz and their alleged co-conspirators. We cannot fault the FBI's occasional failure to record Abscam related conversations.

144. Tr. at 930–35, 1348–49.

(D.C.Cir.1983); *United States v. Reese,* 561 F.2d 894, 898 (D.C.Cir.1977); *Curley v. United States,* 160 F.2d 229, 232–33 (D.C. Cir.), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). It is not necessary that the "evidence foreclose every conceivable premise inconsistent with guilt" because

> [i]f the evidence reasonably permits a verdict of acquittal or a verdict of guilt, the decision is for the jury to make.

*United States v. Carter,* 522 F.2d 666, 682 (D.C.Cir.1975); *Curley v. United States, supra,* 160 F.2d at 237. Thus a judgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt. *United States v. Reese, supra,* 561 F.2d at 898; *United States v. Curley, supra,* 160 F.2d at 232–33. After careful review of the evidence in this case, we are convinced that the district court properly denied the motions for judgment of acquittal made by Ciuzio and Weisz.

### A. *Ciuzio*

■ Ciuzio's defense at trial was based on his assertion that he lacked the intent necessary to be convicted of the crimes charged in the indictment. Specifically, Ciuzio contended that the evidence demonstrated that he never intended for Kelly to be bribed by Amoroso, but rather showed that he was trying to take the money offered by the Abscam operatives for himself.[145] Although there is evidence in the record which supports Ciuzio's defense;[146] there is ample evidence from which a reasonable juror could conclude that Ciuzio intended for Kelly to receive Amoroso's bribe. Accordingly, judgment of acquittal was not appropriate.

The video tape of Kelly's January 8 meeting with Amoroso permitted the jury to observe Kelly's demeanor as Amoroso outlined the obviously corrupt proposal. Kelly registered no surprise or protest, but instead showed his familiarity with the proposal when he told Amoroso that he understood the "protective" purpose for the Arabs' investments in his district.[147] Kelly also demonstrated that he had considered the Arabs' proposal prior to the meeting by discussing specific potential investments with Amoroso.[148] From this evidence the jury could reasonably infer that Ciuzio made good on his promise to Amoroso and Weinberg to "lay out the story" for Kelly.[149]

Furthermore, in a telephone call on December 20, Ciuzio told Weinberg that he had asked Kelly to call him from a "public phone booth," rather than from his congressional office, to discuss the transaction.[150] The next day Ciuzio told Weinberg that Kelly had returned his call as requested and was available to meet Amoroso on January 8.[151] Ciuzio's request that Kelly use an "outside call"[152] to discuss the Arabs' proposal provides evidence from which the jury could infer that Ciuzio was concerned that the subject matter of their conversation not be overheard by persons in Kelly's office. These facts support the conclusion that Ciuzio was aware of the corrupt nature of the transaction, *fully* explained the Arabs' *corrupt* proposal to Kelly, and was working to arrange Amoroso's payment of a bribe to Kelly.

Further support for such a conclusion is provided by the FBI's recording of Ciuzio's meeting with Amoroso and Weinberg on December 19. Ciuzio told Amoroso and Weinberg that Kelly was "already takin[g] money" and that he and Weisz had decided

---

**145.** Tr. at 573, 576–81, 1390–91, 1406–07, 1425–27, 1429, 1432–33, 1438. *See* Brief for Defendant Ciuzio at 45, 49, 52–53.

**146.** *See, e.g.,* Tr. at 954–58, 980.

**147.** Transcript of Meeting of Jan. 8, 1980, at 12–15.

**148.** *Id.* at 14–15, 28–30.

**149.** Transcript of Meeting of Dec. 19, 1979, at 33.

**150.** Transcript of Telephone Call of Dec. 20, 1979, at 2, 8, 10.

**151.** Transcript of Telephone Call of Dec. 21, 1979, at 3.

**152.** Transcript of Telephone Call of Dec. 20, 1979, at 8.

that Kelly should get $100,000 of the Arabs' $250,000 payment because "that['s] what [Kelly] needs to straighten his whole life out." [153] Ciuzio also indicated that he was "obligated to protect" Kelly because a direct payment of a bribe could "compromise him." [154] Ciuzio's statements strongly suggest that he fully expected Kelly to receive a bribe in exchange for his promise to assist the Arabs. Additionally, Ciuzio's concern for protecting Kelly provides a reasonable explanation, consistent with a finding of criminal intent on the part of Ciuzio, for Ciuzio's insistence that Amoroso not bribe Kelly directly, but rather pass the money to Kelly through either Ciuzio or Weisz—evidence which otherwise would support Ciuzio's defense. [155]

On this record, a reasonable juror could conclude beyond a reasonable doubt that Ciuzio knowingly participated in a scheme whereby Amoroso bribed Kelly. That being the case, the district court properly denied Ciuzio's motion for judgment of acquittal and submitted the question of Ciuzio's guilt to the jury.

### B. *Weisz*

█ Like Ciuzio, Weisz' defense was based on his claim that he lacked the intent necessary to be convicted of the crimes with which he was charged. Weisz, however, contended that he was unaware of the corrupt nature of the Arabs' proposal and that he was paid $50,000 simply for arranging the introduction of Kelly to Amoroso and Weinberg. [156] Once again, our review of the record discloses evidence from which a juror could conclude that Weisz knew that the Arabs' proposal involved the payment of a bribe to Kelly and that Weisz intentionally participated in the scheme to achieve that end.

Weisz admitted that he learned of the Arabs' proposal from Rosenberg in October 1979, and it is undisputed that Rosenberg was aware that the proposal involved the payment of bribes to congressmen. [157] Ciuzio told Amoroso and Weinberg that Weisz had given him "the figures" and that he and *Weisz* had decided that *Kelly* should get $100,000. [158] Weisz also admitted that he discussed the transaction with Ciuzio subsequent to Ciuzio's December 19 meeting, and it is undeniable that Ciuzio was made aware of the corrupt nature of the Arabs' proposal at that meeting. [159] It would be entirely reasonable for a juror to infer from these facts that Weisz learned through his conversations with Ciuzio and Rosenberg that the Arabs' proposal involved the payment of a bribe to Kelly.

Likewise, Weisz, in statements recorded by the FBI, revealed that he was aware that the transaction involved the payment of a bribe to Kelly. When asked by Weinberg how the $225,000 balance should be split, Weisz replied, "Its fifty, fifty, fifty, seventy-five;" *Weisz also told Weinberg to give Kelly's share to Ciuzio, who would "take care" of Kelly.* [160] The next day, Weisz was surprised, but unconcerned, when he learned that Amoroso intended to deliver Kelly's $75,000 personally. [161] These

---

**153.** Transcript of Meeting of Dec. 19, 1979, at 17, 39.

**154.** *Id.* at 18–19.

**155.** *Id.* at 19, 36–37; Transcript of Telephone Call of Dec. 21, 1979, at 1–2, 8–10; Transcript of Meeting of Jan. 8, 1980, at 1–11. *See* text at notes 41–42 *supra.*

**156.** Tr. at 583, 609, 1156–58, 1173, 1191, 1221–22, 1234–36, 1238, 1255, 1260–63, 1265, 1274–75, 1281, 1284–86, 1308–09, 1469, 1492–95, 1507. *See* Brief for Defendant Weisz at 24, 26, 33–35, 38, 40–43.

**157.** Tr. at 641–42, 1105–06, 1221–22.

**158.** Transcript of Meeting of Dec. 19, 1979, at 17.

**159.** *Id.* at 11, 14, 17–19, 22, 28–29, 33. Tr. at 1138, 1158, 1234–36, 1267, 1269–70, 1274–75. Ciuzio told Amoroso and Weinberg that he would have to "clear" the transaction with Weisz because it was "his package." Transcript of Meeting of Dec. 19, 1979, at 23–24, 33–34, 36, 52–53.

**160.** Transcript of Telephone Call of Feb. 1, 1980, at 2–3. *See* text at notes 54–55 *supra.*

**161.** Transcript of Meeting of Feb. 2, 1980, at 6–7. *See* text at note 60 *supra.*

statements, coupled with Ciuzio's assertion that Weisz was aware that Kelly's split was $100,000, clearly indicate that Weisz knew that the Arabs' proposal involved the payment of a substantial bribe to Kelly and that Kelly had already received $25,000 of that bribe during his January 8 meeting with Amoroso.[162]

Finally, in his statement to the FBI on February 2, Weisz indicated that

he knew full well that he was instrumental in bringing people together to be corrupted.[163]

From this evidence, a juror could conclude that Weisz was aware that Kelly would receive a bribe from Amoroso during the meeting which Weisz helped to arrange. The evidence of Weisz' participation is clearly proof beyond a reasonable doubt. Accordingly, the district court properly denied Weisz' motion for judgment of acquittal and submitted the question of his guilt to the jury.

## V. DUE PROCESS ISSUE

Subsequent to his first trial, Ciuzio filed a motion to dismiss the indictment against him on the grounds that the FBI's conduct during the Abscam investigation was so outrageous that his prosecution was barred by principles of due process.[164] Although the district court dismissed the indictment against Kelly on due process grounds and granted Ciuzio and Weisz a new trial, it denied Ciuzio's due process motion.[165] Based on the district court's dismissal of the indictment against Kelly, Ciuzio moved to dismiss the aiding and abetting charge

against him and sought to suppress the FBI video tape of Kelly's January 8, 1980 meeting with Amoroso.[166] The district court refused to dismiss the aiding and abetting charge and permitted the video tape to be played for the jury.[167] Ciuzio now contends that the district court erred in denying his various due process motions. We disagree.

 To the extent that Ciuzio's contentions are based on the district court's dismissal of the indictment against Kelly on due process grounds[168] they are foreclosed by our recent decision reversing the district court and ordering reinstatement of the indictment and jury verdict against Kelly. *United States v. Kelly,* 707 F.2d 1460, 1461 (D.C.Cir.1983) (per curiam). As to Ciuzio's argument that the FBI's conduct in furtherance of Abscam was so outrageous that his prosecution would violate principles of due process,[169] we simply note that in *Kelly* we held that the FBI's conduct during the Abscam investigation, as it involved Kelly, did not reach those intolerable or outrageous levels that would violate due process. *Id.* at 1473–74 (opinion of MacKinnon, J.); *id.* at 1476–77 (opinion of Ginsburg, J.). *See Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *United States v. Jannotti,* 673 F.2d 578, 607 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). Since our review of the record reveals no significant distinctions between the FBI's conduct with respect to Ciuzio and its conduct, found constitutionally unobjectiona-

---

**162.** At trial, Weisz lamely explained that the "fifty, fifty, fifty, seventy-five" split involved "four separate packages, but only for three people," denying that Kelly was to receive any money. Tr. at 1284–86, 1308–09.

**163.** Tr. at 817–18, 831, 1074.

**164.** Motion of Defendant Eugene Ciuzio to Dismiss the Indictment on Due Process Grounds, *United States v. Kelly, Ciuzio & Weisz,* No. 80–00340 (D.D.C. filed Feb. 20, 1981), RI 275.

**165.** *United States v. Kelly, supra,* 539 F.Supp. at 370–78. Transcript of Status Call, June 11, 1982, at 9–14.

**166.** Motion of Defendant Ciuzio to Suppress Evidence of January 8, 1980 Meeting Between FBI Agent Amoroso and Richard Kelly, *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. filed July 9, 1982), RI 322; Motion of Defendant Ciuzio to Dismiss Count Two of the Indictment (Aiding and Abetting), *United States v. Ciuzio & Weisz,* No. 80–00340 (D.D.C. filed July 2, 1982), RI 310. *See* note 104 *supra.*

**167.** Motions Tr. at 6. Tr. at 658.

**168.** Brief for Defendant Ciuzio at 22–28, 54–58.

**169.** *Id.* at 59–67.

ble, with respect to Kelly, we reject Ciuzio's due process arguments.

## VI. CONCLUSION

Ciuzio and Weisz have raised a number of issues on appeal. We have carefully considered all of these claims and found all to be without merit. Accordingly, we affirm the judgments of conviction entered by the district court.[170]

*Judgment accordingly.*